# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PETER MURPHY, United<br><br>                   Plaintiff,<br><br>    v.<br><br>MILLENNIUM RADIO GROUP LLC,<br>CRAIG CARTON and RAY ROSSI,<br><br>               Defendants. | Civil Action No. 08-1743(JAP)<br><br>Hearing Date:  July 20, 2009<br>ORAL ARGUMENT REQUESTED<br>**Electronically Filed** |

---

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

SCARINCI HOLLENBECK
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, NJ 07071-0790
201-896-4100
Attorneys for Defendants
*Millennium Radio Group, LLC*
*Craig Carton and Ray Rossi*

Of Counsel:
Thomas J. Cafferty, Esq.
David R. Korzenik, Esq.

Miller Korzenik Sommers LLP
488 Madison Avenue, 11th Fl.
New York, NY 10022
212-752-9200
(Of Counsel)
Attorneys for Defendants

On the Brief:
Thomas J. Cafferty, Esq.
David R. Korzenik, Esq.
Nomi I. Lowy, Esq.

{00491935.DOC}

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT ......................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ................................ 4

LEGAL ARGUMENT ..................................................................... 8

I.    The DMCA Does Not Apply to This Case Because 1) The Original Photo did not include any Copyright Notice; 2) There was no ownership or copyright information embedded in the photo; 3) there was no ownership or author information on, below or next to the Photo; and 4) the fine print gutter credit was not part of any automated or technological copyright management or protection System. ................................................................... 8

II.    Even if DMCA §1202 Applied, The Fact that Defendants Expressly Credited *New Jersey Monthly* Makes it Impossible for Plaintiff to Establish the Kind of Intent that §1202 Requires ........................................................... 15

III.    There Was No CMI On or Next to Plaintiff's Photograph, So there Cannot be Said to be Any "Removal" of CMI ................... 17

IV.    Analysis of the Statutory Factors Shows the Defendants' Use Was Fair ...................................................................... 20

    A.    Purpose and Character of the Use: The Use Was Transformative, a Fact That Weighs Heavily in the Analysis ................................................................... 20

    B.    Nature of the Copyrighted Work: Expressive Nature of the Original Work Has Little If Any Bearing on a Parody Case ....................................... 23

    C.    Amount and Substantiality of the Use in Relation to the Copyrighted Work as a Whole: Extensive Use Is Allowed, Even Required, for a Parody ...................... 23

i

D.    Effect of the Use on the Market for or Value of the Copyrighted Work: Defendants' Use Had No Effect on Potential Sales of the Original Photograph ............................................................. 24

V.    Plaintiff Fails to Plead His Claim for Defamation with Sufficient Specificity .......................................................... 25

VI.   The Statements Allegedly Made by Defendants Constitute Rhetorical Hyperbole and, Thus, Plaintiff's Defamation Claims Must be Dismissed as a Matter of Law ...................................................................................... 27

VII.  An Assertion that Someone is Homosexual is Not Defamatory and, Thus, Plaintiff's Defamation Claims Must be Dismissed as a Matter of Law ............................... 31

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Abella v. Barringer Resources, Inc.,
   260 N.J. Super. 92, 98 (Ch. Div. 1992) ............................................................. 33

Albright v. Morton,
   321 F. Supp. 2d 130, 132-133 (D. Mass. 2004)................................................ 34

Associated Press v. All Headline News Corp.,
   2009 WL 382690 (S.D.N.Y. Feb. 17, 2009)...................................................... 11

Buck v. Savage,
   323 S.W.2d 363 (Tex. Civ. App. 1959).............................................................. 35

Campbell v. Acuff-Rose Music, Inc.,
   510 U.S. 569 (1994)..................................................................... 21, 22, 23, 24

Cipriani Builders, inc. v. Madden,
   389 N.J. Super. 154, 178 (App. Div., 2006) ...................................................... 29

FDIC v. Bathgate,
   27 F.3d 850, 875 (3rd Cir. 1994) ...................................................................... 26

Feggans v. Billington,
   291 N.J.Super. 382, 391-92 (App. Div.1996)..................................................... 32

Govito v. West Jersey Health System, Inc.,
   332 N.J. Super. 303, 305-06 (App. Div. 2000)............................... 16, 20, 32, 38

Gray v. Press Communications, LLC,
   342 N.J. Super. 1 (App. Div. 2001) .............................................................. 38, 39

Hermann v. Newark Morning Ledger,
   49 N.J. Super. 551 (App. Div. 1958) .................................................................. 40

IQ Group v. Wiesner Pub.,
   409 F.Supp.2d 587 ........................................................................ 10, 11, 12, 14

Kelly v. Arriba Soft Corp.,
    77 F.Supp.2d 1116, 1122 (C.D.Cal. 1999) ....................................................... 18

Kotlikoff v. The Community News,
    89 N.J. 62 (1982) ................................................................................. 30, 33

Leibovitz v. Paramount,
    137 F.3d 109 (2d Cir. 1998) ........................................................ 22, 23, 24, 25

Lewis v. Harris,
    188 N.J. 415 (2006) ............................................................................. 37, 39

Lynch v. New Jersey Education Association,
    161 N.J. 152 (1999) ............................................................................. 30, 31

Marathon Petroleum Co. v. LoBosco,
    623 F.Supp. 129 (N.D. Ill. 1985) ............................................................... 29

McClatchey v. Associated Press,
    2007 WL 776103 (W.D.Pa.) ...................................................................... 15

Milkovich v. Lorain Journal Co.,
    497 U.S. 1, 20 (1990) ............................................................................... 28

Nanavati v. Burdette Tomlin Memorial Hosp.,
    857 F.2d 96, 109 (3rd Cir. 1988) ............................................................... 26

Silver v. Lavandeira,
    2009 WL 513031 (S.D.N.Y. Feb. 26, 2009) ................................................ 11

Textile Secrets Int'l v. Ya-Ya Brand Inc.,
    524 F.Supp.2d 1184 (C.D. Calif. 2007) ...................................................... 14

U.S. v. Aid Ins. Co.,
    642 F.Supp. 535 ( E.D. Mo. 1986) ............................................................. 29

Ward v. Zelikovsky,
    136 N.J. 516, 529 (1994) ..................................................................... 29, 33

Wilson v. Bob Grant,
    297 N.J. Super 128 (App. Div. 1996) ...................................................... 31, 32

Zoneraich v. Overlook Hosp.,
    212 N.J. Super. 83 (App. Div. 1986) ........................................................ 27, 28

## **STATUTES**

17 U.S.C. § 1202 ................................................................................ passim

17 U.S.C. § 1202(b) ............................................................... 9, 16, 18, 19

17 U.S.C. § 1202(c) .......................................................................... 11

28 U.S.C. § 1331 ................................................................................ 29

28 U.S.C. § 1367 ................................................................................ 29

N.J.S.A. 2A:143-1 ............................................................................ 35

N.J.S.A. 10:5-4 ................................................................................ 36

N.J.S.A. 26:8A-2(d) ........................................................................ 37

N.J.S.A. 37:1-28 ................................................................... 36, 37, 38

## **OTHER AUTHORITIES**

10 J.L. & Pol'y 635 (2002) ................................................... 35, 38, 39, 40

Restatement (Second) of Torts § 559 .................................................. 33

W. Page Keeton, et al., <u>Prosser and Keeton on the Law of Torts</u>
    § 111, at 773 (5th ed. 1984) ........................................................ 33

## PRELIMINARY STATEMENT

The photograph at issue in this copyright and libel case was taken by the Plaintiff for <u>New Jersey Monthly</u> ("NJM") an d features the Defendants Craig Carton and Ray Rossi, seemingly nude, behind a sign identifying the radio station for which they both worked at the time, New Jersey 101.5 FM, WKXW, owned by Defendant Millennium Radio Group LLC.   Plaintiff was hired to take the photograph by NJM to illustrate its annual Best of Jersey awards, in which Carton and Rossi were named the State's top shock jocks for 2006.

Shortly after the photograph appeared, the Defendants copied it from a print copy of the magazine and posted it on their website to inform their listeners of their award as New Jersey's best shock jocks.   The photograph appeared on two different pages of the print version of the magazine, and in fine print on the side of each page (the "gutter" of the page) the plaintiff was identified in a credit line along with other photographers.   The credit lines listed only the photographers' names; they did not provide a copyright notice.   The credit lines were not attached to, or even near, the photographs, but were in fine print along the gutter of the page.   In copying the photograph, the Defendants did not remove any information. Rather, they posted the photograph on the WKXW website and expressly and at several points identified "New Jersey Monthly" as the source of the image.   The Defendants never had a digital copy of the NJM photograph. It appears that NJM

never posted the photo on its website in the online version of the Best of Jersey 2006 article.

The risqué pose was perhaps meant to match the tone of the Defendants' radio show, but it also stirred amusement among their fans. In mocking either the photograph or the radio hosts – or perhaps both – listeners began submitting parodies of the photograph, using Photoshop to alter the image. The Defendants posted thumbnail versions of these images on their website. Approximately 28 such thumbnails were posted to the WKXW website.

Sometime in June of 2007, counsel for Plaintiff wrote to WKXW accusing the station of violating Mr. Murphy's copyright. The station, entirely surprised by the letter, promptly removed the photograph from the WKXW website along with all of the viewer created thumbnails.

Nevertheless, Plaintiff filed suit against the station owner, Carton and Rossi alleging various copyright infringement and Digital Copyright Management ("DCM") claims, as well as claims for defamation in connection with certain on-air comments allegedly made by Carton and Rossi after the station received the written accusations from Plaintiff's counsel.

Plaintiff's DMCA and copyright claims cannot stand as (1) DMCA does not apply to this case; (2) even if DMCA applied, the fact that Defendants expressly credited NJM makes it impossible for Plaintiff to establish the requisite intent under the statute; (3) there was no copyright management information next to the

photograph so there cannot be said to be any "removal" of that information; and (4) Defendants' use of the work was classic fair use.

In addition, Plaintiff's defamation claims fail for two reasons: (1) procedurally he fails to set forth, with any specificity, the words that he alleges constitute defamation; and (2) substantively, even if Plaintiff's vague allegations were sufficient to plead a cause of action for defamation, the alleged content does not amount to defamation.

Plaintiff generally alleges that Defendants characterized him as untrustworthy, litigious and homosexual during an on-air broadcast. However, Plaintiff fails to set forth the actual words used to create such a "characterization," and thus, fails to satisfy the defamation pleading requirement of specificity. Moreover, asserting that someone is homosexual is not defamatory in any event.

Furthermore,  Defendants' program is a controversial "shock jock" talk show. In fact, Plaintiff acknowledged and encouraged Defendants' shock value by asking them to pose for a controversial photograph. Likewise, Defendants' listeners are well aware of the controversial nature of the talk show and do not tune in to hear factual reporting, but rather, expect to hear provocative remarks.

In short, the undisputed facts of this case do not support a single claim made by Plaintiff and this Court should, thus, grant summary judgment in favor of Defendants.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.       At all times relevant hereto, Defendants Craig Carton ("Carton") and Ray Rossi ("Rossi") worked as "shock jock" radio talk show hosts for WKXW 101.5, owned by Millennium Radio Group, LLC ("Millennium"). Complaint, ¶¶ 3, 4, 5, 10, 11; Answer and Affirmative Defenses ¶¶ 3, 4, 5, 11.

2.       In March of 2006, *New Jersey Monthly* magazine published its "Best of Jersey" feature, identifying Carton and Rossi as the best "shock jocks" of New Jersey for 2006. The photograph at issue in this case (the "NJM Photo") appeared in the print edition of the March 2006 issue of *New Jersey Monthly* to illustrate its "Best of Jersey" feature article.  See Declaration of Eric Johnson in support of Defendants' Motion for Summary Judgment (hereafter "Johnson Decl."), ¶ 2; Johnson Declaration, Exhibit A; Complaint, Exhibit B.

3.       Plaintiff, Peter Murphy ("Murphy"), the photographer who took the NJM Photo while working as an independent contractor for *New Jersey Monthly*, had Carton and Rossi pose for the NJM Photo while Carton and Rossi were semi-nude standing behind the WKXW station logo, which they held over their mid sections. Complaint, ¶10, Exhibit B; Answer and Affirmative Defenses, Fourth Affirmative Defense.

4.       WKXW made a copy of the NJM Photo of Carton and Rossi by scanning a copy of the relevant page from the print copy of the March 2006 edition of New Jersey Monthly and then posted the image on the WKXW website.

WKXW noted specifically that the NJM Photo was from "*New Jersey Monthly*." Johnson Decl., ¶ 3; Johnson Decl., Exhibit B; Complaint, Exhibits C, G and H.

5.     WKXW made a point of identifying *New Jersey Monthly* as the source of the NJM Photograph. WKXW did so because the station wanted to report to listeners that Carton and Rossi had been named "Best of Jersey" Shock Jocks for 2006 by *New Jersey Monthly* magazine. Carton and Rossi also informed their listeners of that fact on their show. Johnson Decl., ¶ 4; Johnson Decl., Exhibit B; Complaint Exhibits C, G and H.

6.     There was no copyright notice on either of the two pages of *New Jersey Monthly* on which the NJM Photo was printed; there was no watermark embedded or printed into the NJM Photo that identified its owner or photographer; and no ownership or copyright or credit information was located under the NJM Photo, on it or even next to it. Johnson Decl., ¶ 5; Johnson Decl., Exhibit A; Complaint, Exhibit B.

7.     In fine print along the gutter of the printed page there appeared a credit line where Plaintiff Murphy and other photographers were credited. Johnson Decl., ¶ 6; Johnson Decl., Exhibit A; Complaint, Exhibit B.

8.     The copy of the NJM Photo that the station used came from the print copy of the magazine.  Upon information and belief, the NJM Photo did not appear in the online version of the Best of Jersey 2006 feature that *New Jersey Monthly* posted on its own website and the station is unaware of any electronic or digital

version of the NJM Photo that was ever published or posted by *New Jersey Monthly* or by Plaintiff. Johnson Decl., ¶ 7; Johnson Decl., Exhibit C.

9.     At the time that WKXW posted the NJM Photo on its website, the station believed in good faith that *New Jersey Monthly* owned the rights (or licensed exclusive rights) to the NJM Photo and that the magazine approved the station's use of the image on the station's website. The station believed that *New Jersey Monthly* sought mention of their feature and their issue in other media – as publications the station deals with often and typically do.  The station reported on the special Best of Jersey feature on the Carton and Rossi program and believed in good faith that *New Jersey Monthly* controlled the rights to the photograph. Johnson Decl., ¶ 8.

10.    Shortly after the posting of the NJM Photo, viewers began sending in altered/Photo-shopped thumbnails of it – with their humorous alterations to the photograph.   All of them reflected viewers' humorous comments on the NJM Photo and its subjects.  Johnson Decl., ¶ 9; Johnson Decl., Exhibit B; Complaint Exhibits C, G and H.

11.    WKXW posted the NJM Photo on its own website to report on the *New Jersey Monthly*, its Best of Jersey special feature, and the naming of Carton and Rossi as Best of Jersey Shock Jocks.  Such reports are typical reports of newsworthy stories in other publications that are given proper mention by

broadcasters and other media. Use of related photographs in such reports or adjunct to them is common and accepted. Johnson Decl., ¶10.

12.     Sometime in June of 2007, WKXW received a letter from Plaintiff's counsel Maurice Harmon accusing the station of violating Mr. Murphy's copyright. The station was entirely surprised by the letter. The station promptly removed the NJM Photo from the WKXW website along with all of the viewer created thumbnails.  The station is aware of no other uses of the NJM Photo. WKXW never sold any copies of the NJM Photo and charged no one any fee to see it. Johnson Decl., ¶ 11.

13.     At the time that WKXW copied the NJM Photo, the station believed that *New Jersey Monthly* either owned the work or had exclusive rights to it.  The gutter credit, which the station did not see, would not in any event have dispelled that belief since a photo credit is used to identify the photographer who took a photograph, not the person who owns it.   Johnson Decl., ¶ 12.

14.     Plaintiff alleges that after the station was contacted by Plaintiff's attorney, while Mr. Rossi and Mr. Carton were on the air, they "impugn[ed] Murphy's personal integrity and repeatedly characterized him in a factual way as 'a man not to be trusted' in a business environment; a man who 'will sue you' if you have business dealings with him and, in substance, as a man with whom 'a person should avoid doing business.'" Plaintiff also alleges that Mr. Rossi and Mr. Carton "inferred Plaintiff was a homosexual." Plaintiff's Complaint, ¶ 16.

## LEGAL ARGUMENT

I.    **The DMCA Does Not Apply to This Case Because 1) The Original Photo did not include any Copyright Notice; 2) There was no ownership or copyright information embedded in the photo; 3) there was no ownership or author information on, below or next to the Photo; and 4) the fine print gutter credit was not part of any automated or technological copyright management or protection System.**

This case is a standard copyright infringement action involving the use of a single photograph. But Plaintiff hopes to build upon it a novel DMCA 1202 claim – alleging at Counts 9-12 that Defendants intentionally "removed" "copyright management information" from the photograph – specifically, the photo credit which appeared in small type in the gutter of the page in New Jersey Monthly on which the Photo appeared. DMCA 1202, if viable in these circumstances, would have special attractions for plaintiffs, among other things:   a) if applicable, it allows for Statutory Damages and Attorneys' Fees even if the photo was not registered (plaintiff's photograph was not timely registered); b) Statutory Damages can range from a minimum of $2500 to a maximum of $25,000 per infringing work which is more than the usual standard statutory damages of $250 up. If this claim were to apply in cases such as this, there would be no real need for standard copyright.

The facts related to these allegations are simple and are not in dispute.  The only dispute is a question of law: whether posting the photograph but not the gutter credit line amounted to intentionally "removing" CMI under 17 U.S.C. § 1202(b).

Section 1202 states, in relevant part:

(b)   No person shall, without the authority of the copyright owner or the law –

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute … works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

The information at issue in this case is: 1) nothing more than a photography credit (not even a copyright notice) in a print magazine (not even in digital form); 2) a fine print credit not even located on or next to the photo in question; 3) one located in the gutter of the page (already removed and remote from the photo that it was crediting); and 4) most significantly, not part of any automated or technological copyright management or protection system. Significantly, when WKXW posted the photo on its web site, it expressly credited NJM as the source. On these facts, the defendants' actions cannot by any stretch be said to be a violation of § 1202.

Although few cases have addressed § 1202, the leading case, IQ Group v. Wiesner Pub., 409 F.Supp.2d 587 (D.N.J. 2006), was decided in this district in 2006. In that case, Judge Greenway carefully studied the legislative history and

analyzed legal scholarship before concluding that § 1202 applied only to technological measures designed to protect a copyrighted work.

> "It should not be construed to cover copyright management performed by people, which is covered by the Copyright Act, as it preceded the DMCA; it should be construed to protect copyright management performed by the technological measures of automated systems." *Id.* at 597.

A review of the path the IQ court followed to its conclusion is helpful in understanding the proper scope of § 1202. The IQ case arose from a dispute over e-mailed advertisements.  IQ, an advertising company, sent ads for two insurance companies via e-mail to insurance agents.  The ads featured IQ's logo and a hyperlink that directed users to a page on IQ's Web site that included IQ's copyright notices.  After the ads were distributed, the two insurance companies engaged Wiesner, another advertising service, and provided that company with the IQ ads. Wiesner removed the IQ logo and hyperlink, replaced them with new information, and distributed the revised ads via e-mail. IQ then sued Wiesner, claiming, among other things, that the IQ logo and hyperlink constituted CMI and that Wiesner's removal of that information violated the DMCA.

The court initially looked at the statute's own definition of CMI, which encompasses a broad range of information, including a work's title and other identifying information; the name and other information about the author or copyright owner; the name of a performer, writer or director; terms and conditions for use; and identifying numbers or symbols referring to such information.

17 U.S.C. § 1202(c). Finding this definition to be so broad that the section, "read literally, applies wherever any author has affixed anything that might refer to his or her name," the court concluded that the legislative history and extrinsic sources demonstrated that "the statute should be subject to a narrowing interpretation."[1] 409 F.Supp.2d at 593. The sources the court relied on included law review articles by experts on the intersection of copyright and new technology; a report by the Working Group on Intellectual Property Rights that was the product of a task force charged with shaping information technology policies and recommending changes to the law; the treaties of the World Intellectual Property Organization, of which the DMCA was the implementing statute; and reports of the Congressional committees that shepherded the DMCA into law.

In an exhaustive analysis, the court drew a number of conclusions about the intent and purpose of the DMCA. For example, it endorsed the scholarly view that the "DMCA directly protects not the copyrights, but the technological measures that protect the copyrights." Id. The court also found that the WIPO treaties viewed

---

[1] By contrast, in <u>Associated Press v. All Headline News Corp.</u>, 2009 WL 382690 (S.D.N.Y. Feb. 17, 2009), the court, addressing the DMCA issue in three brief paragraphs, did not challenge the <u>IQ</u> court's conclusions on the legislative history and intent, but opted to consider only the bare language of the statute. Because the defendants there offered no textual support for their arguments, the court declined to dismiss the DMCA claim. Just over a week later, another judge in the Southern District of New York adopted in full a magistrate's conclusion, citing <u>IQ</u>, that a plaintiff who simply inserted her name into her work, without more, could not invoke the protections of the DMCA. <u>Silver v. Lavandeira</u>, 2009 WL 513031 (S.D.N.Y. Feb. 26, 2009).

technical measures like CMI as "components of automated copyright protection systems." 409 F.Supp.2d at 594. "The WIPO treaties, and hence the DMCA," the court found, "protect CMI so as to protect the technological measures of copyright protection themselves." Id.   The court pointed to multiple references in the Working Group's report, commonly known as the "White Paper," demonstrating that CMI was understood to be information included in digital works that would put "rights management systems" into effect. "Such systems are conceived of as electronic and automated." Id. at 595.

In reviewing Congressional reports from the legislative process, the court found that Congress viewed § 1202 as complementing § 1201, which focuses on circumvention of protection systems.

> Chapter 12, as a whole, appears to protect automated systems which protect and manage copyrights. The systems themselves are protected by § 1201 and the copyright information used in the functioning of the systems is protected in § 1202. Id. at 597.

In short, the DMCA was meant to amend the Copyright Act to include technological copyright protection systems, not to augment remedies for standard copyright infringement.   Nor was it intended as a way for plaintiffs to seek enhanced statutory damages without meeting the usual registration requirements - precisely what this Plaintiff seeks to do here.

The IQ court held: "To come within § 1202, the information removed must function as a component of an automated copyright protection or management

system." Id. The court described these systems as not simply any processes that employ technology but as "technological measures that can control access and reproduction of works, and thereby manage the rights of copyright owners and users." Id. Applying this rule to the IQ advertisement, the court found that neither the logo nor the hyperlink served as part of an automated copyright protection system and, therefore, the defendant had not violated § 1202. Id.

Nor did the "Jersey Guys" violate § 1202 by posting the plaintiff's photograph on their Web site. The information the plaintiff alleges to be CMI is no more than a photography gutter credit in a print magazine. The credit was not a component of an automated copyright system that controlled either access to the photograph or reproduction of it. Indeed, the photograph seems to have been published only in the print version of NJM, not on its Web site. Following this District's rule in IQ v. Wiesner, § 1202 cannot apply to this case.

That the photograph was taken from a print magazine and posted on the Internet does not transform this case from a traditional copyright action to an appropriate challenge under the DMCA. In IQ, the court recognized that the advertisement was sent via e-mail, "and thus likely copied and distributed as part of an automated process within a computer network," but emphasized that "this does not bring the information within § 1202." Id. at 597.

In this case, the photo credit served only to credit the person who took the photograph – it was not a copyright notice. It was part of a line of type in a print

magazine, not part of an automated copyright protection system. It was not, for example, a watermark within the photo whether digital or otherwise. The photo credit did not in any way control or manage a copyrighted work, by technological or automated means, and the statute, therefore, does not apply.

Another case that explored this issue in depth, <u>Textile Secrets Int'l v. Ya-Ya Brand Inc.</u>, 524 F.Supp.2d 1184 (C.D. Calif. 2007), followed the reasoning of the <u>IQ</u> court. In considering a claim involving a fabric design, the <u>Textile Secrets</u> court concluded that a name printed on the selvage, or the border, of a piece of fabric and a copyright notice on a tag attached to the fabric – quite similar to the information printed in the gutter of the print magazine page in this case – could not implicate § 1202 of the DMCA.

One case that reached a different result did so based on significantly different facts than those presented here.  In <u>McClatchey v. Associated Press</u>, 2007 WL 776103 (W.D.Pa.), the court denied summary judgment for the Associated Press, which contended that a copyright notice ***printed on*** the plaintiff's photograph did not constitute CMI.  The plaintiff there had used a "technological process" to print the title, her name and the copyright notice on all printouts of her photograph.  Summary judgment was denied, in part, because – unlike in this case – the facts involved a dispute over cropping the photograph.  2007 WL 776103 at 6. Unlike <u>McClatchey</u>, in this case 1) the plaintiff used ***no automated system*** to embed any copyright information into the photo; 2) the ***defendants did not crop***

*out any embedded information*; and 3) *no credit or copyright notice was on or next to the photograph.*

If the plaintiff's argument that the DMCA should apply to a photography credit in a print magazine were to succeed, every time a photograph was published without its original credit would give rise to a violation of the statute. That interpretation would also convert all garden-variety copyright infringement claims to DMCA claims with expanded remedies and extend the exclusive rights granted by the Copyright Act. By adding the DMCA as a 12th section of the Copyright Act, Congress demonstrated its intent that the new sections would supplement, not supplant or overtake, the original act. To interpret the DMCA's provisions as broadly as the plaintiff has would disregard that intent and statutory design. Counts 9 through 12 of Plaintiff's complaint should be dismissed with prejudice.

## II. Even if DMCA §1202 Applied, The Fact that Defendants Expressly Credited *New Jersey Monthly* Makes it Impossible for Plaintiff to Establish the Kind of Intent that §1202 Requires

Even if the DMCA did apply to this case, Plaintiff's claim would fail because § 1202 imposes liability only for knowing misconduct, which is not present here.

The lack of knowing misconduct is incontrovertibly manifest in one undeniable fact: *the defendants at no time presented the photograph as their own work; rather, they expressly identified "New Jersey Monthly" as its source*. The photograph came from a print copy of NJM, and the magazine had the right to use

it.   Thus, the defendants' crediting of the magazine was not only accurate, it negates any possible argument that they intentionally removed CMI, knew that any CMI had been removed or used the photograph knowing that such removal will induce infringement.

Section 1202(b), which addresses removing or altering CMI, sets a high bar, imposing liability only for "*intentionally*" removing or altering CMI or distributing copies "*knowing*" that CMI has been removed or altered.   Additionally, § 1202(b) requires that a person acted "*knowing*" or having reasonable grounds to know that the action would "induce, enable, facilitate, or conceal an infringement."   17 U.S.C. § 1202.

When NJM sent a photographer to take pictures of the defendants for the sole purpose of illustrating their "Best of New Jersey" award, defendants reasonably viewed the photograph as by NJM, for NJM, and belonging to NJM. Not surprisingly, they credited NJM when they posted the photograph on their Web site to draw attention to the article and their award.   Indeed, NJM did have an exclusive license from the plaintiff to use the photograph in the magazine. According to the Agreement between Plaintiff Murphy and NJM, Murphy had no right to use the photo even non-exclusively during the initial publication period. See Declaration of Eric Johnson ¶12.

Identifying NJM as the source gave notice to any visitor to the site that the photograph did not belong to the defendants.   That alone demonstrates a lack of

intent to remove CMI or to induce others to infringe any copyright.  In these circumstances, the plaintiff cannot possibly adduce any evidence or advance any theory that would establish the requisite levels of knowledge or intent for liability under the DMCA.

**III.   There Was No CMI On or Next to Plaintiff's Photograph, So there Cannot be Said to be Any "Removal" of CMI**

Defendants simply did not "remove" the credit or any other identifying information from the photograph.  Rather, they scanned a print copy of the photograph and posted it online without including the credit line, which was neither on the photograph nor adjacent to it -- but in the gutter on another part of the magazine page.  However one might like to define CMI, it was in no way "removed." There was no CMI attached to the photograph, and therefore none to be removed.

In such circumstances, § 1202(b)(1) does not apply.  That provision, which forbids a person to "intentionally remove or alter any copyright management information," does not apply to copies of works but rather, "[b]ased on the language and structure of the statute ... applies only to the removal of copyright management information on a plaintiff's product or original work." Kelly v. Arriba Soft Corp., 77 F.Supp.2d 1116, 1122 (C.D.Cal. 1999), aff'd and rev'd in part on other grounds, 336 F.3d 811 (9th Cir. 2003).  The defendants here, who used a copy of the plaintiff's photograph in a print magazine, cannot be found to have

removed CMI from the original photograph.  Consequently, there is no liability under § 1202(b(1).

In <u>Kelly v. Arriba Soft</u>, the defendant operated a "visual search engine" that scoured the Internet for images related to a query submitted by a user. <u>Id.</u> at 1117. The search produced a number of thumbnail images, which were copies of photographs found on other Web sites and reduced to a small size for display on the defendant's site. <u>Id.</u>  The defendant maintained a database of about two million of these thumbnail images, among them about 35 images copied from the plaintiff's site. <u>Id.</u>  The plaintiff contended that the defendant had violated § 1202(b) by displaying the thumbnail images without the corresponding CMI, which consisted of standard copyright notices in the text surrounding the images on the plaintiff's Web site. <u>Id.</u> at 1121-22.  Because the copyright notices were not on the images themselves, the search engine, which copied only the images, did not pick up that information. A click on an image provided the Web site where the photograph originated, allowing an interested user to seek copyright information on the original site. <u>Id.</u> at 1122.  In those circumstances – which did not show that the defendant's "actions were intentional, rather than merely an unintended side effect" <u>id.</u> – the court found that the defendant did not have reasonable grounds to know it would cause its users to infringe the plaintiff's copyrights. <u>Id.</u>  Similarly, the defendants here copied the photograph without picking up the credit line from a separate part of the magazine page, but they did plainly identify the source of the

photograph as NJM. In the face of that fact, it is impossible for plaintiff to show that defendants either intentionally omitted the photography credit or knew that omitting the credit – which provided no notice of copyright – would have any bearing on the plaintiff's rights.

The Jersey Guys used the NJM photograph not only to announce their NJM award but also to poke fun at themselves. Joining in the fun, listeners submitted altered versions of the photograph, in which they changed Carton and Rossi's appearance or added humorous words or otherwise parodied the not-so-shocking nude photograph of the "shock jocks." The defendants posted these images online as well, inviting other listeners to "**send in your Photoshopped alterations of the Jersey Guys *New Jersey Monthly* photo.**" At no time did the defendants present the photograph as their own work or as that of their listeners. Rather, it was clearly identified as coming from NJM. A caption beneath the photo on their Web site said, **"Craig and Ray bare it all for *New Jersey Monthly*."** (Complaint, Exhibit C.) Even the URL for the page that contained the photos submitted by listeners included **"n-jmonthly"** in the address. (Complaint, Exhibit G.) In these circumstances, plaintiff cannot possibly show that defendants had reasonable grounds to know that posting the photograph without the credit line – either as a simple copy or a listener-altered copy – might induce any copyright infringement. There can be no liability under § 1202(b)3).The DMCA Claims should be dismissed with prejudice.

## IV.   Analysis of the Statutory Factors Shows the Defendants' Use Was Fair

The viewer's altered thumbnails of the plaintiff's photograph are innocently transformative and the defendants' posting of them is typical fair use. Similarly, defendants' initial use of the photograph to inform their viewers of the newsworthy fact of their selection as Best of Jersey shock jocks for 2006 by NJM magazine is typical and transformative fair use.

According to the Complaint, 28 copies of the photograph submitted by Jersey Guys listeners were posted as thumbnail sketches on the station's Web site. The listeners altered the photos, adding verbal or visual flourishes to create parodies of the image. These humorously altered versions mocked not only Carton and Rossi but also the photograph itself. This sort of transformative work is at the heart of the fair use doctrine. The listeners' purpose in using the photograph was to comment on the work itself, as well as on its subject. If that were not fair use, the plaintiff could hail each of those listeners into court, expanding this litigation beyond any reasonable or equitable boundary. Such an avenue should not be open to the plaintiff, and his claims should be dismissed.

A review of the four § 107 factors demonstrates that use of the plaintiff's photograph was permitted by law.

### A.   Purpose and Character of the Use: The Use Was Transformative, a Fact That Weighs Heavily in the Analysis

In <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569 (1994), Justice Souter emphasized that the first factor, which evaluates the purpose and character of the use, had overriding significance, and that the focus should be on whether the use was "transformative." <u>Id</u>. at 579. "[T]he more transformative the new work," he found, "the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." <u>Id.</u>

A work is transformative if it "adds something new," if it has "a further purpose or different character" than the original work, or if it alters the original "with new expression, meaning, or message." <u>Id.</u> The thumbnail photographs at issue here are a prime example of a transformative use. Their very purpose was to present an image with a new character and to create an alternative message by using the photograph for comic effect or to mock the photographer's choice of the risqué pose. One of the thumbnails, for example, adds the words "Will work for ratings" to the image, highlighting how the photograph itself is evocative of the iconic image of a poor man wearing a barrel. In another, labeled "Brokeback Guys," a listener apparently sought to mock the photographer's decision to have the Jersey Guys pose seemingly nude by covering Rossi's face with the image of the gay cowboy played by Jake Gyllenhaal in the film "Brokeback Mountain." The listeners' comedic efforts were not necessarily successful, nor were they especially high-brow commentary. But that has no bearing on the outcome of this case.

"Whether … parody is in good taste or bad does not and should not matter to fair use." Id. at 582.

Courts consistently recognize use of a work as part of a joke or ironic comment as a transformative use. In Leibovitz v. Paramount, 137 F.3d 109 (2d Cir. 1998), the photographer Annie Leibovitz complained that her photograph of the nude and pregnant Demi Moore, taken for the cover of *Vanity Fair*, was used in a humorous ***advertising*** poster for Leslie Nielsen's feature film *Naked Gun 33 1/3*. The Court accepted the humorous use of Leibovitz's work as transformative, finding that it commented on the original and was a fair use. Interestingly, the Naked Gun 33⅓ poster was a sight-gag that the court acknowledged had little to do with the content of the film – beyond the fact that it involved humor.

The transformative nature of the use in this case overwhelms any commercial aspect.  Even in Leibovitz, where the use of the image – in an advertisement for a major Hollywood film – was essentially purely commercial, the parodic nature weighed in favor of the defendant.   Here, there was no commercial use of the photograph, other than its presence on the station's Web site.  The defendants did not employ the photograph for any commercial purpose; rather, it was the focus of critical commentary and parody.   And the station was using the photograph to provide the newsworthy information to its listeners to tell them that Jersey Guys had been selected Best of Jersey for 2006.  It does not help the plaintiff's cause that the radio station is  run for profit. Fair use is not limited to those who make little or

no profit.  Indeed, commerciality does not lead to a presumption against fairness. Campbell v. Acuff-Rose, 510 U.S. at 574.  If that were the case, the presumption would preclude nearly every example of fair use provided in § 107, for those activities – news reporting, criticism, research, etc. – are generally conducted by profit-making institutions. Id.

Because the listeners' alterations were a transformative use of the photograph, intended to produce commentary and comic effect, this factor weighs heavily in the defendants' favor.

### B.   Nature of the Copyrighted Work: Expressive Nature of the Original Work Has Little If Any Bearing on a Parody Case

The second fair use factor, which takes into account the expressive nature of the copyrighted work, is of little aid in this case. As Justice Souter noted in the Acuff-Rose case, this factor is never likely "to help much in separating the fair use sheep from the infringing goats in a parody case," because parodies, by necessity, typically copy expressive works. Campbell v. Acuff-Rose, 510 U.S. at 586.

### C.   Amount and Substantiality of the Use in Relation to the Copyrighted Work as a Whole: Extensive Use Is Allowed, Even Required, for a Parody

The third factor attempts a quantitative analysis of the use of the copyrighted work.  Complicated in any context, this factor is especially difficult in assessing a parody.  Unlike other creative works, a parody's success lies in its imitation of the original.  Accordingly, the parody must frequently use the heart of the copyrighted

work. Id. at 587. "When parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." Id. at 588. Weighing just how much use is excessive is entwined with the analysis of the first factor (purpose and character of the use) and the fourth (likelihood that the parody will affect the market for the original). See id. "That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist." Leibovitz, 137 F.3d at 116. Because the overriding purpose in this case was to parody the original and because the resulting works have no likelihood of serving as a market substitute for the original, this factor weighs in favor of the defendants despite the extensive use of the copyrighted work.

**D.    Effect of the Use on the Market for or Value of the Copyrighted Work: Defendants' Use Had No Effect on Potential Sales of the Original Photograph**

This final factor, like the others, turns on the parodic and transformative nature of the use. In weighing this factor, the focus is not on whether the use is commercial, nor on whether any harm might result from criticism. Rather, the point of the inquiry is to assess whether the defendant's use might serve as a market substitute for the original. In the case of parody, "it is more likely that the new work will not affect the market for the original ... by acting as a substitute for it. ... This is so because the parody and the original usually serve different market

functions." Id. at 591 (citations omitted).  In short, because "there is no protectible derivative market for criticism," id. at 592, there is no market harm in this case.

Even beyond the use of the photograph as part of a parody, the unique circumstances in this case meant there simply was no market for the photograph beyond the original use.  The image is of a radio team that is no longer together. And the decision to have the team pose nude behind a sign with the station's call letters limits the potential market all the more.  Although the image may have served the initial purpose of NJM, it is difficult to imagine a market for this image. Should such a market exist, the defendants' parodic use of the image does nothing to supplant it.  This factor weighs heavily in the defendants' favor.

The transformative nature of the thumbnail images in this case bears significantly on the analysis of the fair use factors.  Taken together, these factors heavily favor a conclusion that defendants' use of the photograph was transformative, that it was intended to comment humorously on the original photograph and its subjects, and that it does not interfere with the market for the original photograph or for any works derived from it. Accordingly, the use was fair and noninfringing, and the Plaintiff's copyright claims should be dismissed.

## V.   Plaintiff Fails to Plead His Claim for Defamation with Sufficient Specificity

To satisfy pleading requirements for defamation claims, a plaintiff must identify the alleged defamatory statements or the source of the defamatory

statements with sufficient specificity. FDIC v. Bathgate, 27 F.3d 850, 875 (3rd Cir. 1994).

> In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication…A plaintiff may be permitted to bolster a defamation cause of action through discovery, but not to file a conclusory complaint to find out if one exists.

Id. (citations omitted). See also Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 109 (3rd Cir. 1988) (allegedly actionable statements in a defamation claim must be set forth with particularity).

Plaintiff, in his Complaint, merely characterizes the statements alleged to have been made by Defendants in the following manner: "combative" and a "personal attack upon Murphy and his good name and reputation in his business, trade and profession." (Complaint, ¶ 16). He alleges that the Defendants made "continued vituperative, false statements about Murphy," and "impugn[ed] Murphy's personal integrity." Id. These allegations are nothing more than conclusory statements that fail to put Defendants on notice of the allegedly defamatory words which constitute the basis for Plaintiff's Complaint.

Plaintiff states that Defendants "characterized" him as a "'man not to be trusted' in a business environment; a man who 'will sue you' if you have business dealings with him and, in substance, as a man with whom 'a person should avoid doing business.'" Id. Plaintiff alleges that Defendants also *inferred* Plaintiff was a homosexual. Id. Plaintiff does not state how Defendants allegedly "characterized"

Plaintiff as an untrustworthy, litigious person with whom one should avoid doing business. There is no indication of what words were allegedly said to create such a characterization. Furthermore, there is no indication of how Defendants allegedly *"inferred"* that Plaintiff was a homosexual.

In Zoneraich v. Overlook Hosp., 212 N.J. Super. 83 (App. Div. 1986) cert. denied, 107 N.J. 32 (1986) the court, in dismissing  plaintiff's defamation claim, noted that "[n]o other part of the complaint alleges when, where, by which defendants and by what words, written or oral, plaintiff was defamed." Id.

> A complaint must contain a statement of the facts on which the claim is based, showing that plaintiff is entitled to relief. It must state the essential elements of a cause of action simply, concisely and directly. In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication. A vague conclusory allegation is not enough.

> The need to plead a cause of action for defamation is not avoided by telling defendants to seek a more definite statement or discovery. A plaintiff may be permitted to bolster a defamation cause of action through discovery, but not to file a conclusory complaint to find out if one exists. Such a complaint must be dismissed.   Id. at 101-02 (internal citations omitted).

Likewise, the same result is mandated here, as Plaintiff's Complaint is conclusory and fails to state when, where, by which defendants and by what words Plaintiff was defamed.

## VI.   The Statements Allegedly Made by Defendants Constitute Rhetorical Hyperbole and, Thus, Plaintiff's Defamation Claims Must be Dismissed as a Matter of Law

In <u>Milkovich v. Lorain Journal Co</u>., 497 U.S. 1, 20 (1990) the United States Supreme Court declared that rhetorical hyperbole, vigorous epithets, and loose figurative language are types of speech protected from state libel actions. This is so because they cannot reasonably be interpreted as assertions of fact. This protection "provides assurance that public debate will not suffer for lack of "imaginative expression" or the 'rhetorical hyperbole' which has added much to the discourse of our Nation." <u>Id</u>. at 20.

Name-calling is similarly protected. In <u>Ward v. Zelikovsky</u>, 136 <u>N.J</u>. 516, 529 (1994)[2], the New Jersey Supreme Court stated:

> Although perhaps directly injurious to a person, name-calling does not have a defamatory content such that harm to reputation can be shown.

So in <u>Cipriani Builders, inc. v. Madden</u>, 389 <u>N.J. Super</u>. 154, 178 (App. Div., 2006) the Appellate Division, in holding that use of the phrases "lowly maneuvers", "illegal rule-breaking" and "dissension-causing tactics" were not actionable defamation, stated:

---

[2] Plaintiff has filed this action pursuant to 28 U.S.C. § 1331 (Federal Question) and 1338 (Copyright). His defamation claims are joined under 28 U.S.C. § 1367 (Supplemental Jurisdiction). Federal courts must apply state substantive law in nondiversty cases in the absence of a compelling federal interest. <u>U.S. v. Aid Ins. Co.</u>, 642 F.Supp. 535 ( E.D. Mo. 1986). A federal court exercising supplemental jurisdiction over a claim based on state law must apply state substantive law to the supplemental claim. <u>Marathon Petroleum Co. v. LoBosco</u>, 623 F.Supp. 129 (N.D. Ill. 1985). Therefore, the defamation claims will be governed by New Jersey substantive law.

> Although perhaps directly injurious to a person, name-calling does not have a defamatory content such that harm to reputation can be shown. "Likewise, courts differentiate between defamatory statements and statements of rhetorical hyperbole." In determining whether an alleged defamatory statement was actually only rhetorical hyperbole, a court must consider whether the statement is verifiable. <u>Id</u>. (internal citations omitted).

As Robert Sack in his treatise, Sack on Defamation, has noted: Name-calling, too, is recognized as such by the listener. It is not susceptible to a determination of truth or falsity and, indeed, "negate[s] the impression that the writer was seriously maintaining" a statement of fact.

In <u>Kotlikoff v. The Community News</u>, 89 <u>N.J.</u> 62 (1982), the New Jersey Supreme Court applied the rhetorical hyperbole protection to a letter to the editor. The newspaper published a letter to the editor, written by a private citizen, which accused a local Mayor of being "engaged in a huge cover up" and alleged the Mayor was part of a "conspiracy." The court found that the terms were employed in a "loose, figurative sense" and as rhetorical hyperbole, and that the letter could not be "interpreted as charging plaintiff with committing a criminal offense." <u>Id</u>. at 72.

In <u>Lynch v. New Jersey Education Association</u>, 161 <u>N.J.</u> 152 (1999) then New Jersey State Senator, John A. Lynch, Jr., asserted that campaign material describing him as "The Boss of Bosses" and claims that he was a partner or officer of "mob-owned companies fined for illegal toxic dumping" and the people with whom he kept company as "mobsters as business partners", "mobsters as clients"

defamed him.  In holding that the words were non-actionable hyperbole and name-calling the New Jersey Supreme Court stated:

> Whether a statement is defamatory depends on its content, verifiability, and context.  Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it. If a statement has more than a literal meaning, the critical consideration is what a reasonable reader would understand the statement to mean.  So viewed, insults, epithets, name-calling, and other forms of verbal abuse, although offensive, are not defamatory. Id. at 167 (internal citations omitted).

The Court further observed:

> The context of a statement can affect significantly its fair and natural meaning.  Id. at 168 (internal citations omitted).

> Wilson v. Bob Grant, 297 N.J. Super 128 (App. Div. 1996) cert. denied 149

N.J. 34 (1997) is illustrative of these principles.  In Wilson, the court observed:

> Here, Grant's full remark was "sick, no good, pot smoking, wife beating skunk."  We acknowledge that the words "wife-beating," taken alone, could be defamatory, especially in light of our society's heightened awareness of domestic violence. When "wife-beating" is considered in the context with the remaining words, however, we are satisfied that the language is mere name-calling or verbal abuse. "The common law has always differentiated sharply between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name calling, and other verbal abuse." Id. at 136-137 (internal citations omitted).

The court further stated:

> In addition to the above circumstances, when considering context we also look at the "medium by which the statement is disseminated and the audience to which it is published." Grant made his remarks during the broadcast of his controversial talk-radio show.  Grant's listeners

knew that he would make provocative and caustic remarks during his broadcast.

Indeed "[t]he ordinary reasonable recipient of a communication naturally discounts to some degree statements made in the heat of vitriolic battle, because the recipient understands and anticipates the human tendency to exaggerate positions during the passions and prejudices of the moment." Id. at 137-138 (internal citations omitted).

Application of these principles leads inevitably to the conclusion that the speech at issue here is rhetorical hyperbole or name-calling and thus not actionable. Like the program in Wilson, so also the program in which these comments were made was a controversial talk-radio show. The photograph taken by Plaintiff was to illustrate a designation of Defendants, Rossi and Carton, as "shock jocks." And like the listeners to the show in Wilson, so also the listeners to Carton and Rossi expected provocative and caustic remarks. Simply put, the comments alleged to have been made by Rossi and Carton amount to nothing more than rhetorical hyperbole and, as such, are not actionable.

## VII. An Assertion that Someone is Homosexual is Not Defamatory and, Thus, Plaintiff's Defamation Claims Must be Dismissed as a Matter of Law

Plaintiff claims that Defendants defamed him when they, *inter alia*, "derogatorily inferred Plaintiff was a homosexual." See Complaint, Paragraph 16. Even assuming Plaintiff had pled that Defendants had *expressly* stated that Plaintiff was homosexual, which not even Plaintiff alleges they did, saying that someone is homosexual is not defamatory.

To prove defamation, Plaintiff must establish: (1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with the requisite level of fault; (6) that such communication is not subject to privilege; and (7) that such communication caused damage.  <u>See</u> <u>Govito v. West Jersey Health System, Inc.</u>, 332 <u>N.J. Super.</u> 303, 305-06 (App. Div. 2000); <u>Feggans v. Billington,</u> 291 <u>N.J.Super.</u> 382, 391-92 (App. Div.1996); <u>Abella v. Barringer Resources, Inc.,</u> 260 <u>N.J. Super.</u> 92, 98  (Ch. Div. 1992).

> At the heart of every action for libel or defamation is the threshold issue of whether the language used is reasonably susceptible of a defamatory meaning. It is well established that that question is one of law to be resolved by the court.

<u>Kotlikoff v. Community News</u>, 89 <u>N.J.</u> 62, 67 (1982).  The Restatement (Second) of Torts § 559 defines a defamatory statement as one that:

> [t]ends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

<u>Ward v. Zelikovsky</u>, 136 <u>N.J.</u> 516, 529 (1994).  W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 111, at 773 (5th ed. 1984) defines defamation as "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, good-will or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." <u>Ward v. Zelikovsky</u>, <u>supra</u>, at 529.

Thus, this Court must determine whether, as a matter of law, it is defamatory to infer that someone is homosexual – i.e. whether it "tends so to harm the reputation of that person as to lower him in the estimation of the community as to deter third persons from associating or dealing with him."  See Restatement (Second) of Torts § 559.

> In 2004, a statement implying that an individual is a homosexual is hardly capable of a defamatory meaning.[3]
>
> *     *     *
>
> This Court may well be the first to have the opportunity to assess plaintiffs' claims in the light of recent decisions giving legal force to homosexuals' ongoing quest for equal rights. In this day and age, recent rulings by the Supreme Court and the Supreme Judicial Court of Massachusetts, undermine any suggestion that a statement implying that an individual is a homosexual is defamatory. In fact, a finding that such a statement is defamatory requires this Court to legitimize the prejudice and bigotry that for too long have plagued the homosexual community.

Albright v. Morton, 321 F. Supp. 2d 130, 132-133 (D. Mass. 2004), affd., Amrak Prods. v. Morton, 410 F.3d 69 (1st Cir. 2005).

In this day and age, and certainly in such a cosmopolitan and progressive State as New Jersey, it cannot be said that homosexuality is a characteristic that tends so to harm the reputation of that person as to lower him in the estimation of the community as to deter third persons from associating or dealing with him.

> …the community in which a statement is uttered uniquely governs the boundaries of defamation law. It has long been noted that changes in social sensibilities as well as varying judicial attitudes in the fifty plus

---

[3] Of course, this statement is even more compelling in 2009.

jurisdictions - federal and state - account for sharp contradictions and controversy in the determination of what is or is not defamatory. Therefore, while it is conceivable that decisions from other courts correctly reflect the public policy of those jurisdictions, opinions of homosexuality vary depending on the region of the country. For example, one could, at the very least, expect that the opinion commonly held about homosexuality in Texas in 1980 would differ drastically from that in New Jersey in 2001. So illustrated, the potential for substantial variation in public policy between states and across decades surely renders the persuasive value of certain defamation decisions questionable at best.

See Journal of Law and Policy, 10 J.L. & Pol'y 635, 665 (2002)(footnotes omitted).

"[M]any courts have assessed contemporary social mores by way of local and state legislation." Id. at 664. And while societal values and attitudes toward homosexuality have certainly evolved throughout the country over the past decade, New Jersey has clearly been at the forefront in this regard. Indeed, New Jersey's case law and legislation reflect the changed social status of homosexuals in our State and the progressive attitude and opinion toward homosexuality that have been adopted in this particular region of the country.[4]

It cannot be seriously disputed that this State has evidenced a strong public policy of protecting the rights of gays and lesbians:

---

[4] Significantly, while some states have held that falsely claiming that a person is homosexual is actionable as defamation per se because it imputes the commission of the crime of sodomy, see e.g. Buck v. Savage, 323 S.W.2d 363 (Tex. Civ. App. 1959), that argument does not hold true in New Jersey where the crime of sodomy has been repealed. See N.J.S.A. 2A:143-1, Repealed, effective September 1, 1979.

> New Jersey was one of the first states to adopt comprehensive legislation prohibiting discrimination based on affectional or sexual orientation and one of the first states to formally recognize domestic partnerships by enacting the "Domestic Partnership Act," P.L. 2003, c.246 (C.26:8A-1 et seq.) on January 12, 2004 thereby guaranteeing in law certain rights and benefits to those individuals who enter into domestic partnerships...

See N.J.S.A. 37:1-28.  Specifically, in 1992, the New Jersey Legislature amended this State's Law Against Discrimination (LAD) to include a provision prohibiting discrimination based on affectional or sexual orientation.   N.J.S.A. 10:5-4 provides:

> § 10:5-4. Obtaining employment, accommodations and privileges without discrimination; civil right
>
> ***All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of*** race, creed, color, national origin, ancestry, age, marital status, ***affectional or sexual orientation***, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. ***This opportunity is recognized as and declared to be a civil right.*** (Emphasis added).

Thereafter, in 2003, the Legislature passed the "Domestic Partnership Act," which provides, *inter alia*:

> All persons in domestic partnerships should be entitled to certain rights and benefits that are accorded to married couples under the laws of New Jersey, including: statutory protection through the "Law Against Discrimination," P.L.1945, c.169 (C.10:5-1 et seq.) against various forms of discrimination based on domestic partnership status, such as employment, housing and credit discrimination; visitation

rights for a hospitalized domestic partner and the right to make medical or legal decisions for an incapacitated partner; and an additional exemption from the personal income tax and the transfer inheritance tax on the same basis as a spouse. The need for all persons who are in domestic partnerships, regardless of their sex, to have access to these rights and benefits is paramount in view of their essential relationship to any reasonable conception of basic human dignity and autonomy, and the extent to which they will play an integral role in enabling these persons to enjoy their familial relationships as domestic partners and to cope with adversity when a medical emergency arises that affects a domestic partnership, as was painfully but graphically illustrated on a large scale in the aftermath of the tragic events that befell the people of our State and region on September 11, 2001[.] N.J.S.A. 26:8A-2(d).

On October 25, 2006, the New Jersey Supreme Court held that the equal protection guarantee of Article I, paragraph 1, of the New Jersey State Constitution was violated by denying rights and benefits to committed same-sex couples which were given to their heterosexual counterparts.   Lewis v. Harris, 188 N.J. 415 (2006).  In Lewis, the Supreme Court expressly recognized that times and attitudes toward homosexuals have changed.

> *Times and attitudes have changed, and there has been a developing understanding that discrimination against gays and lesbians is no longer acceptable in this State, as is evidenced by various laws and judicial decisions prohibiting differential treatment based on sexual orientation.*
>
> *             \*        \*        \*        \**
>
> On the federal level, moreover, the United States Supreme Court has struck down laws that have unconstitutionally targeted gays and lesbians for disparate treatment.

Id. at 438 (emphasis added)(citations omitted).  In December, 2006, after Lewis v. Harris was decided, both Houses of the New Jersey State Legislature passed

legislation establishing Civil Unions in this State, <u>N.J.S.A</u>. 37:1-28 et seq., expressly finding and declaring, *inter alia*, that:

a.   Same-sex couples in New Jersey live together in committed relationships without the benefits and rights afforded to heterosexual couples who choose to marry;

b.   Promoting such stable and durable relationships as well as eliminating obstacles and hardships these couples may face is necessary and proper and reaffirms this State's obligation to insure equality for all the citizens of New Jersey;

\*   \*   \*

f.   The Legislature has chosen to establish civil unions by amending the current marriage statute to include same-sex couples. In doing so, ***the Legislature is continuing its longstanding history of insuring equality under the laws for all New Jersey citizens by providing same-sex couples with the same rights and benefits as heterosexual couples who choose to marry***. <u>N.J.S.A</u>. 37:1-28 (emphasis added).

Based on New Jersey's steadfast commitment to the eradication of conduct that discriminates against people on the basis of their sexual orientation, any "[j]udicial declaration that homosexuality harms one's reputation is therefore entirely antithetical to the will of the majority as expressed in legislation." <u>See</u> 10 J.L. & Pol'y 635, <u>supra</u>.

Although the Appellate Division, in the case of <u>Gray v. Press Communications, LLC</u>, 342 <u>N.J. Super</u>. 1 (App. Div. 2001) <u>cert</u>. <u>denied</u> 170 <u>N.J</u>. 390 (2001), concluded that "a false accusation of homosexuality is reasonably susceptible to a defamation [sic] meaning," <u>Id</u>. at 10, that case is not only distinguishable from the present situation but also, more important, it cannot be

reconciled with more recent legislation and case law, which "do not support the conclusion that reference to an individual as a homosexual lowers the community's estimation of the individual's reputation." See *Journal of Law and Policy*, 10 J.L. & Pol'y 635, 636 (2002).

Significantly, Gray was decided ***before*** New Jersey passed the Domestic Partnership Act, ***before*** Lewis v. Harris was decided, and ***before*** New Jersey passed legislation establishing Civil Unions in this State – all of which more accurately reflect this State's current community attitude of acceptance of homosexuality, by fully incorporating gays and lesbians into the community and prohibiting discriminatory conduct directed against people by virtue of their sexual orientation.  And though even the Court in Gray acknowledged that "society has come a long way in recognizing a persons' right to freely exercise his or her sexual preferences," Gray, supra, at 12, New Jersey had not, at the time that case was decided, come nearly as far as it has today, as reflected in more recent legislation and case law.

> Additionally, inasmuch as Gray legally sanctions negative perceptions of gays and lesbians, it also implicitly tolerates, and may well foster, homophobia in New Jersey.  Though defamation is a civil wrong and does not carry the impact of attributing criminal status to a class of individuals,  the  fact  remains  that  judicial  determinations  in defamation suits unequivocally label certain acts or classes of people as undesirable. Allowing homosexuality to remain on the list of "legally offensive" terms may prevent gays and lesbians from reporting bias or hate crimes against them. In a jurisdiction that has articulated an interest in protecting homosexuals from this very type of isolation, it is antithetical for a court to declare that one person's

legally protected, public acknowledgement of homosexuality is another's cause for a lawsuit. See 10 J.L. & Pol'y 635 at 680.

Concluding that referring to someone as a homosexual is defamatory because it "tends so to harm the reputation of that person as to lower him in the estimation of the community as to deter third persons from associating or dealing with him" is no different from concluding that referring to someone as an African American is defamatory. It legitimizes that which cannot be sanctioned in this day and age. While, unfortunately, there is a segment of the population that may be deterred from associating or dealing with a person because of sexual orientation or color of skin, that view is not one that is held by "a substantial number of respectable people," see Hermann v. Newark Morning Ledger, 49 N.J. Super. 551 (App. Div. 1958), and particularly not in a State such as New Jersey, where the statement at issue was allegedly made in this case.

In essence, "allowing defamation suits of this nature is tantamount to declaring homosexuality offensive; it permits juries to award damages on a necessary presumption that one is damaged by such imputations." See 10 J.L. & Pol'y 635 at 674. To permit such a presumption would be to take a giant step backwards with regard to current community attitudes toward homosexuality in this State. Such a result cannot be sanctioned.

## CONCLUSION

For the foregoing reasons, this Court should grant Summary Judgment in favor of Defendants and dismiss the Complaint in its entirety.

Respectfully submitted,

SCARINCI HOLLENBECK
Attorneys for Defendants

By: _/s/ Thomas J. Cafferty_
       THOMAS J. CAFFERTY, ESQ.

Dated:  June 10, 2009

{00491935.DOC}