UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                          :
PETER MURPHY,                             :
                                          :
                    Plaintiff,            :
        v.                                :        Civil Action No. 08-1743 (JAP)
                                          :
MILLENNIUM RADIO GROUP LLC, et al.:
                                          :        **OPINION**
                    Defendants.           :
_____:

PISANO, District Judge.

        This is an action alleging copyright violations and defamation brought by Plaintiff

Peter Murphy against Millennium Radio Group LLC ("MRG"), the owner of the radio station

WKXW 101.5, and two of its talk show hosts, Craig Carton and Ray Rossi.  Presently before

the Court is a motion by Defendants for summary judgment.  Plaintiff has opposed the motion

and the Court decides the matter without oral argument pursuant to Federal Rule of Civil

Procedure 78.  For the reasons below, Defendants motion is granted.

I.      Background

        At all times relevant to this action, Defendants Carton and Rossi worked as "shock

jock" radio hosts for WKXW, the radio station owned by defendant MRG.  Defendants

Statement of Material Facts ("DSF") and Plaintiff's Response to DSF ("Pl. R.") ¶¶ 1.  In

March 2006, New Jersey Monthly magazine published a feature entitled "Best of New

Jersey," naming Carton and Rossi as the best shock jocks of New Jersey for that year.  *Id.* ¶¶

2.  A photograph of Carton and Rossi taken by Plaintiff Murphy appeared in the print edition

of New Jersey Monthly and accopanied this feature article.  *Id.*  At the time the photograph

was taken, Murphy was working as an independent contractor for New Jersey Monthly.  *Id.* ¶¶

3.

The photograph at issue showed Carton and Rossi appearing semi-nude while holding

a WKXW radio station logo across their mid sections.  *Id.*  WKXW made a copy of the photo

by scanning the print copy of the March 2006 edition of New Jersey Monthly and then posted

the image on the radio station's website.  *Id.* ¶¶ 4.  The image was also posted on the website

myspacetv.com on a page that contained material referring to Carton and Rossi.  Complaint ¶

12, Exs. D, E.

No copyright notice appeared on either of the two pages of New Jersey Monthly on

which the photo was printed.  DSF and Pl. R. at ¶¶ 6.  Nor was there a watermark embedded

or printed into the photo that identified its owner or photographer, *id.*, rather, a credit in fine

print appeared in the gutter of the printed page where Murphy, along with other

photographers, was credited, *see* Complaint, Ex. A.  This credit was inserted onto the page by

a New Jersey Monthly magazine employee who composed the page using Adobe InDesign

software.  Declaration of Donna Panagakos.

A short time after the photo appeared on the radio station's website, visitors to the site

began sending in copies of the photo after making their own alterations to it.  *See, e.g.*,

Complaint, Ex. H.  For example, one of the altered images had Carton and Rossi in bikini tops

and displayed the phrase "2007 Jersey Girls Calendar" in place of the station's logo on the

sign held by the pair.  *Id.*, Ex. G.  Another photo showed Carton and Rossi holding a sign

altered to read "Will Work For Ratings."  The images that were submitted were altered to varying degrees, some contained significant alterations while others reflected only minor changes.  *Id.*, Exs. G, H.  The radio station encouraged visitors to their website to create these images by posting "Send in your Photoshopped alterations of The Jersey Guys NJ Monthly photo" on the station's website.  *Id.*, Ex. C.  The station displayed the visitor's altered photos on its site.  *See id.*, Exs. G, H.

In or about June of 2007, the radio station received a letter from Murphy's attorney accusing the station of violating Murphy's copyright.  DSF and Pl. R., ¶¶ 12.  Surprised by the letter, the station promptly removed the photo from its website along with all of the images submitted by visitor's to the website.  *Id.*  Plaintiff alleges that sometime thereafter, during Carton and Rossi's radio show, Carton and Rossi "impugn[ed] Murphy's personal integrity and repeatedly characterize[d] him  in a factual way as 'a man not to be trusted' in a business environment; a man who 'will sue you' if you have business dealings with him and, in substance, as a man with whom 'a persons should avoid doing business.'"  Compl. ¶ 16.  Plaintiff further alleges that Carton and Rossi "inferred Plaintiff was a homosexual."  *Id.*

This action followed.  Plaintiff brings claims for copyright infringement, violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, *et seq*., and defamation. The complaint contains the following counts:  Count I--Copyright Infringement Against Millennium, Count II--Copyright Infringement Against Carton, Count III--Copyright Infringement Against Rossi, Count IV--Vicarious Copyright Infringement Against Millennium, Count V--Contributory Copyright Infringement Against Carton, Count VI--

Contributory Copyright Infringement Against Rossi, Count VII--Contributory Copyright

Infringement Against Millennium, Count VIII--Vicarious Copyright Infringement Against

Millennium, Count IX--Violation of the DMCA Against Millennium, Count X--Violation of

the Digital Millennium Copyright Act Against Carton, Count XI--Violation of the Digital

Millennium Copyright Act Against Rossi, Count XII--Vicarious Infringement of the Digital

Copyright Act Against Millennium, Count XIII--Defamation of Character Against Carton,

Count XIV--Defamation of Character Against Rossi, Count XV--Defamation of Character

Against Millennium.  Defendants have moved for summary judgment on all claims.

II.      Analysis

A.  Summary Judgment Standard

      A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil

Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which

facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could

return a verdict" for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219

n.3 (3d Cir. 1988).

      On a summary judgment motion, the moving party must show, first, that no genuine

issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the

moving party makes this showing, the burden shifts to the non-moving party to present

evidence that a genuine fact issue compels a trial.  *Id.* at 324.  In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party.  *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

B.   Digital Millennium Copyright Act Claims

The DMCA states, in the relevant part,

(b) Removal or alteration of copyright management information.--No person shall, without the authority of the copyright owner or the law--

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202.

Plaintiff asserts that Defendants violated § 1202 of the DMCA by removing "copyright management information," specifically, the fine print gutter credit that was located on the magazine page. As relevant to the instant case, § 1202 defines "copyright management information as follows: "the term 'copyright management information' means any of the following information conveyed in connection with copies ... of a work ... : (2) The name of, and other identifying information about, the author of a work." *Id.*

Defendants, relying upon *IQ Group, Ltd. v. Wiesner Publishing, LLC*, 409 F. Supp. 2d 587 (D.N.J. 2006), argue that the DMCA does not apply to these facts. The *IQ* court addressed the interpretation of "copyright management information" as it is used in § 1202, and found that "[t]o come within § 1202, the information removed must function as a component of an automated copyright protection or management system." *Id.* at 597. The court explained that such systems are "technological measures that can control access and reproduction of works, and thereby manage the rights of copyright owners and users." *Id.*

While, as Plaintiff points out, the *IQ* court's interpretation of the statute is not binding on this Court, the Court finds the decision's reasoning persuasive and concurs with its interpretation of the statute. Consequently, the Court finds that each of Plaintiff's claims under the DMCA must fail. Here, the information Plaintiff alleges to be "copyright management information," is simply a photography credit in the gutter of a print magazine. It was in no way a "component of an automated copyright protection or management system." Further, the fact that a New Jersey Monthly employee used a software program to compose

the page and insert the gutter credit does not bring this case into the scope of the DMCA.  The

DMCA "should not be construed to cover copyright management performed by people, which

is covered by the Copyright Act, as it preceded the DMCA; it should be construed to protect

copyright management performed by the technological measures of automated systems."  *Id.*

As Defendants point out, if Plaintiff's argument regarding the photography credit was

correct, each time, for example, a magazine photograph was reproduced without its original

credit a violation of the DMCA would occur.  Indeed, virtually all garden-variety copyright

infringement claims would be converted to DMCA claims, supplanting the original Copyright

Act.  As an added section to the Copyright Act, the DMCA is clearly intended so supplement

the act; the result urged by Plaintiff would completely disregard statutory intent and design.

Thus, for the above reasons, Plaintiff's claims under the DMCA shall be dismissed.

B.    Fair Use

Defendants argue that the altered photographs submitted by visitors to the website as

well as Defendants use of the unaltered photograph constituted fair use of the work.  The

doctrine of fair use "confers a privilege on people other than the copyright owner, 'to use the

copyrighted material in a reasonable manner, without his consent, notwithstanding the

monopoly granted to the owner.'"  *Video Pipeline, Inc. v. Buena Vista Home Entertainment,*

*Inc.*, 192 F. Supp. 2d 321, 335 (D.N.J. 2002) (quoting *Marcus v. Rowley*, 695 F.2d 1171, 1174

(9th Cir.1983)).  "Fair use is a mixed question of law and fact," therefore, the issue may be

resolved on summary judgment if the Court determines that a reasonable trier of fact could

reach only one conclusion.  *Id.* at 560-61.

7

The fair use defense is  codified at 17 U.S.C. § 107, which reads in the relevant part as follows:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107.  The Court examines each of this factors in turn.

1.    Purpose and Character of Use

The central purpose of the investigation relating to this first factor is to see "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S. Ct. 1164, 1171 (1994) (citations omitted).  Indeed, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*  "Although such transformative use is not absolutely necessary for a

finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.  Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Id.*  Notably, the potential reach of the transformative use defense is broad.  *Hilton v. Hallmark Cards*, -- F.3d --, 2010 WL 1039872 *10 (9th Cir. 2010).

The Court finds this factors weighs heavily in favor of Defendants.  The Defendants initial use of the unaltered photograph, as shown, *e.g.*, in Exhibit C of the complaint, had a different purpose than the original work.  Defendants use was designed to inform visitors to the station's website of the New Jersey Monthly feature.  The text beneath the photo states "Craig and Ray bare it all for New Jersey Monthly" and the text in corner of the photo, although somewhat cut off, clearly references the "Best Shock Jocks" award.

Likewise, the altered photos posted on the website are transformative, as they "add something new" and have " a further purpose or different character than the original work." *Id.* at 579.  The altered photos present the image with a new character and an alternative message, using the photograph for comic effect or to poke fun at the photographer's choice of pose.  Although some may view the altered photographs and feel that the comedic efforts on the part of some may not have been particularly successful, this does not effect the fair use analysis.  "The question of whether a use is transformative does not rise or fall on whether the use perfectly achieves its intended purpose." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (citing Campbell, 510 U.S. at 582, 114 S.Ct. 1164 (declining to evaluate the quality of the parody and declaring that "when fair use is raised in defense of

parody, [the threshold question] is whether a parodic character may reasonably be perceived")).  Here, to the extent that the use of the images may have had some commercial purpose, this is far outweighed by the transformative nature of the use.

2.      Nature of the Copyrighted Work

      The Court agrees with Defendants that this factor is of little aid in this case.  As the Court noted in *Campbell*, this second factor is not likely "to help much in separating the fair use sheep from the infringing goats in a parody case," because of the very nature of such cases -- parodies typically copy expressive works.  510 U.S. at 586.  The Court, therefore, finds this factor neutral in the analysis.

3.      Amount and Substantiality of Use

      In a case such as the present, "the third-factor inquiry ... concerns 'what else the parodist did besides go to the heart of the original.'"  *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 589).  However, even where the parodist goes beyond what may be necessary," "*Campbell* instructs that a parodist's copying of more of an original than is necessary to conjure it up will not necessarily tip the third factor against fair use.  *Id.*, (citing *Campbell*, 510 U.S. at 588).  Rather, "once enough has been taken to assure identification ... the reasonableness of taking additional aspects of the original depends on the extent to which the overriding purpose and character of the copy is to parody the original and the likelihood that the parody may serve as a market substitute for the original."  *Id.* (citation omitted).  As noted by the Second Circuit, "[t]hat approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors

favor the parodist." *Id.*  Because those factors weigh in favor of fair use here, this factor is of little help to Plaintiff.

4.    Effect of Use on Potential Market

Here, the only economic impact of the challenged use identified by Plaintiff is that he would have likely offered a license to Defendants for their use had they asked.  This, however, does not help Plaintiff.  Courts have rejected such arguments as Plaintiff's, noting that "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006).  The Court, therefore, finds this fourth factor favors Defendants.  Consequently, the Court finds that the balance of the four factors above weighs in favor of Defendants, and the finds that Defendants' use of the work was fair use.  Plaintiffs copyright infringement claims shall be dismissed.

C.    Defamation

As noted above, Plaintiff alleges that during Carton and Rossi's radio show, Carton and Rossi "impugn[ed] Murphy's personal integrity and repeatedly characterize[d] him in a factual way as 'a man not to be trusted' in a business environment; a man who 'will sue you' if you have business dealings with him and, in substance, as a man with whom 'a persons should avoid doing business.'" Compl. ¶ 16.  Plaintiff further alleges that Carton and Rossi "inferred Plaintiff was a homosexual." *Id.*   Defendant argues that Plaintiff's defamation

claims should be dismissed because (1) Plaintiff has failed to plead them with sufficient specificity; (2) the statements alleged made constitute rhetorical hyperbole; and (3) an assertion that someone is homosexual is not defamatory.

1.      Plaintiff's Defamation Claim is Sufficiently Pled

        In the case of a complaint charging defamation, the plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication; a vague conclusory allegation is not enough.  *F.D.I.C. v. Bathgate*, 27 F.3d 850, 875 (3d Cir.1994). Specifically, under New Jersey law, "the plaintiff bears the burden of establishing, ... that the defendant '(1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff.' " *Petersen v. Meggitt*, 407 N.J. Super. 63, 969 A.2d 500, 507 (App. Div.2009) (quoting *Feggans v. Billington*, 291 N.J. Super. 382, 390-91, 677 A.2d 771 (App. Div.1996)).  Here, the complaint contains a summary of the allegedly defamatory words, their speakers, and the fact of their publication.  Under the relevant liberal pleading standards, the Court finds that Plaintiff has put Defendants on sufficient notice of the claims against them and has stated his defamation claim with the requisite specificity.

2.      The Alleged Statements Are Rhetorical Hyperbole

        "Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court."  *Ward v. Zelikovsky*, 136 N.J. 516, 529, 643 A.2d 972 (1994). In determining whether a statement is defamatory, a court "must consider the content, verifiability, and context of the challenged statements." *Id.*  "The 'content' analysis requires

courts to consider the 'fair and natural meaning that will be given [to the statement] by reasonable persons of ordinary intelligence.' " *DeAngelis v. Hill*, 180 N.J. 1, 14, 847 A.2d 1261 (N.J. 2004). Verifiability refers to whether a statement can be proven true or false, and statements that are not verifiable, such as insults and name-calling, even if offensive, are not defamatory. *Lynch v. New Jersey Educ. Ass'n*, 161 N.J. 152, 164-65, 735 A.2d 1129 (1999). Thus, although the "use of epithets, insults, name-calling, profanity and hyperbole may be hurtful to the listener ... such comments are not actionable." *DeAngelis*, 180 N.J. at 14. The last component, context, is examined because it bears upon the "fair and natural meaning" of a statement. *Lynch*, 161 N.J. at 168.

Of particular importance in the instant case is the context of the alleged statements. There is no dispute that the statements were alleged to have been made during a shock jock radio show in which Defendants Rossi and Carton typically delivered provocative and caustic dialogue to their audience. Indeed, the nature of the radio show is underscored by the photograph at issue in this case -- it appears that Plaintiff attempted to portray the show's controversial and humorous character by having the two shock jocks pose seemingly nude behind their radio station's logo. Having considered the content, verifiability and context of the alleged comments, the Court finds them to be nothing more than rhetorical hyperbole, name calling or verbal abuse. Consequently, Plaintiff's defamation claims shall be dismissed.

3.      The Assertion that Someone is Homosexual is Not Defamatory

Had the Court found that the alleged statements were not rhetorical hyperbole, the Court would nevertheless dismiss that part of Plaintiff's defamation claim founded upon the

allegation that Carton and Rossi "inferred Plaintiff was a homosexual."  Comp. ¶ 16.

Because the New Jersey Supreme Court has not spoken on the issue of whether such a statement is defamatory -- that is, whether it "tends so to harm the reputation of that person as to lower him in the estimation of the community as to deter third persons from associating or dealing with him"[1] --, this Court must predict how it would decide the issue were it confronted with the question.  *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993).  Plaintiff argues that the decision in *Gray v. Press Communications LLC*, 342 N.J. Super 1 (App. Div. 2001) is indicative of how the New Jersey Supreme Court would decide the issue.  In *Gray*, the Appellate Division held that "a false accusation of homosexuality is reasonably susceptible to a defamation meaning." 342 N.J. Super. at 10.

Five years after *Gray* was decided, the New Jersey Supreme Court decided *Lewis v. Harris*, 188 N.J. 415, 438 (2006) (holding that the equal protection clause of the New Jersey Constitution was violated by denying the rights and benefits to committed same-sex couples that were given to their heterosexual counterparts), in which the court detailed the evolution of the State's public policy in protecting gays and lesbians from discrimination.  In that decision, the court noted that "[t]imes and attitudes have changed, and there has been a developing understanding that discrimination against gays and lesbians is no longer acceptable in this State."  Further relevant developments after *Gray* was decided included the State's legal recognition of gay and lesbian relationships through the Domestic Partnership Act, 26:8A-1 to -13 and the creation of civil unions, see N.J.S.A. 37:1-28, *et seq.*  Given the decision in *Lewis*

---

[1]Restatement (Second) of Torts § 559.

and the recognized evolution of the societal landscape, it appears unlikely that the New Jersey Supreme Court would legitimize discrimination against gays and lesbians by concluding that referring to someone as homosexual "tends so to harm the reputation of that person as to lower him in the estimation of the community as to deter third person from associating or dealing with him."  Consequently, that part of Plaintiff's defamation claim alleging that Defendants implied that Plaintiff was homosexual fails.

III.    Conclusion

       For the reasons above, Defendants' motion for summary judgment is granted.  An appropriate Order accompanies this Opinion.


                                       /s/ JOEL A. PISANO
                                       United States District Judge